**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 14, 2025

**BY ECF AND EMAIL**
The Honorable Alvin H. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. David Smothermon,* S1 19 Cr. 382 (AKH)**

Dear Judge Hellerstein:

The Government respectfully submits this letter in advance of the sentencing of defendant David Smothermon (the "defendant"), scheduled for November 20, 2025. On May 8, 2025, the defendant pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, as charged in the above-captioned superseding indictment. The defendant pled guilty pursuant to a written plea agreement (the "Plea Agreement") in which the parties agreed that the applicable sentencing range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") was 63 to 78 months' imprisonment (the "Stipulated Guidelines Range").

In the Presentence Investigation Report ("PSR"), the Probation Department ("Probation") calculated the Guidelines range to be 78 to 97 months' imprisonment. Probation recommends a below-Guidelines sentence of 48 months' imprisonment. The defendant has requested a noncustodial sentence to include five years of probation, substance abuse and mental health treatment, 200 hours of community service, and ten months of home confinement.

For the reasons set forth below, the Government respectfully submits that a substantial term of imprisonment is necessary to achieve the goals of sentencing in this case. However, the Government agrees with Probation and the defense that a sentence below the Guidelines range is appropriate. The Government submits that a substantial term of incarceration, consistent with Probation's recommended sentence of 48 months, would be sufficient, but not greater than necessary, to achieve the legitimate ends of sentencing.

## A. Background

### 1. Offense Conduct

The offense conduct relates to the defendant's employment by a privately-held company headquartered in New York ("the Victim Company"). The Victim Company was engaged in the international marketing, distribution, and trading of commodities products. (PSR ¶ 9). The Victim Company had a subsidiary based in Houston, Texas (the "Victim Subsidiary") which specialized in the trading of liquified petroleum gas ("LPG"), including the physical trading of LPG and financial derivative trading related to LPG. Specifically, the Victim Subsidiary both entered into

and executed contracts for the purchase and sale of actual barrels of LPG (the "Physical Trading"), as well as engaged in the trading of financial derivative products tied to LPG prices (the "Financial Trading"). (PSR ¶ 11). During the relevant period – that is, from at least in or about December 2015 through at least in or about September 2016 – the defendant was the Chief Executive Officer of the Victim Subsidiary and was a member of the Victim Company's Board of Directors. (PSR ¶ 10).

Beginning in or about December 2015, the defendant began falsely inflating the values he assigned to individual trading positions in the Financial Trading book. (PSR ¶ 11). He also directed other employees of the Victim Subsidiary to manually change the terms of Physical Trading contracts in the company's accounting system to make it appear as though those contracts were substantially more profitable than they were. (PSR ¶ 11). The defendant took these measures in order to obtain a significant discretionary bonus that was to be awarded in May 2016 and related to his 2015 performance. As a result of the defendant's falsely inflated values in the Financial Trading book and the defendant's manipulation of the contract terms in the Physical Trading contracts, the company's accounting systems substantially overestimated the profitability of the defendant's trading business. Indeed, the Victim Subsidiary's accounting system indicated that the defendant was breaking even or incurring small losses, when in fact the defendant had incurred approximately $200 million in losses. (PSR ¶¶ 11, 14).

In 2016, the Victim Company began its internal discussions to award discretionary bonuses to its employees for 2015 performance. (PSR ¶ 12). While the cash available for bonuses was initially based on trading results from 2015, the decision to award a bonus to an employee, and how much bonus to award that employee, was not made until May 2016. In email communications with executives in New York, the defendant complained about the discretionary nature of the company's bonus program. He also had a dispute regarding the bonus program with the company's primary HR professional. In addition, prior to getting his bonus, the defendant was planning to make an investment in a real estate project, and his ability to obtain a financing commitment for that investment turned on the size of his bonus. (PSR ¶ 12.)

In May 2016, the Victim Company awarded the defendant a total bonus of approximately $15 million – over $11 million of which was paid immediately.[1] The company would not have awarded the defendant this bonus had it known about the extent of his trading losses in the first quarter of 2016. (PSR ¶ 13.) And, had the company known that the defendant was intentionally mismarking his positions and changing terms in contracts in order to conceal losses and inflate his performance in order to induce the company into awarding him this bonus, the company likely would have taken even more severe action.

In late August 2016, the defendant was contacted by a senior company executive to alert him that the company had unearthed a discrepancy between a Physical Trading contract and what was entered in the accounting system for that contract, and that individuals from New York were planning to visit Houston to conduct a broader review of the Victim Subsidiary's Physical Trading contracts, among other things. A few days later, on or about September 1, 2016, the defendant resigned abruptly and admitted to a company executive that he had been mispricing his trading book. A subsequent audit by the Victim Company revealed that the defendant had concealed over $200 million in trading losses. This led the company to sell its trading positions and realize

[1] The remainder of the bonus was never paid by the Victim Company.

considerable losses that resulted in a significant downsizing of the company and the layoffs of hundreds of employees. (PSR ¶ 14.)

The impact of the defendant's conduct will be more fully described in a Victim Impact Statement to be submitted by the Victim Company in advance of sentencing.

**2. Procedural History**

On November 6, 2018, the defendant was arrested pursuant to a criminal complaint charging him with one count of wire fraud in violation of Title 18, United States Code, Sections 1343 and 2. (Dkt. 1). The defendant was released on bail. On or about May 23, 2019, a grand jury sitting in this District returned a one-count indictment charging Smothermon with wire fraud in violation of Title 18, United States Code, Sections 1343 and 2 (the "Original Indictment," Dkt. 25). In the Original Indictment, the defendant was charged pursuant to a "right to control" theory of wire fraud – specifically, that the defendant's false entries led the Victim Company to substantially overvalue various positions it held and defrauded the company of its right to control its assets.

After the Court denied a motion by the defendant to transfer venue to the Southern District of Texas, Houston Division, trial was scheduled for June 29, 2020. (Dkts. 41, 43, 45). As a result of the Covid-19 pandemic, the trial date was later adjourned to March 8, 2021, then to October 18, 2021, then to June 20, 2022, and eventually to November 14, 2022. (Dkts. 50, 57, 64, 69). However, in August 2022, before the November 2022 trial date, the Court granted the defendant's request to adjourn the trial pending the Supreme Court's rulings in *Percoco v. United States* and *Ciminelli v. United States*, in which the Court was expected to address "right to control" theory of wire fraud. (Dkt. 75). In May 2023, the Supreme Court issued its opinion. *See Ciminelli v. United States*, 598 U.S. 306, 309 (2023). Thereafter, the parties engaged in extensive discussions regarding the appropriate next steps and a potential pretrial resolution. Those discussion did not result in an agreement to resolve the case short of trial and, on or about May 14, 2024, a grand jury returned the superseding indictment.

On July 19, 2024, the defendant moved to dismiss the superseding indictment, arguing that the superseding indictment did not allege a cognizable theory of wire fraud pursuant to *Ciminelli*. (Dkt. 102). Following full briefing, the Court denied the defendant's motion to dismiss in a written opinion on September 18, 2024. (Dkt. 107). Thereafter, trial on the superseding indictment was scheduled for June 9, 2025.

On May 8, 2025, after the parties had begun preparations for trial – including the Government's retention of a third-party expert and substantial disclosure of expert testimony pursuant to Rule 16(G) of the Federal Rules of Criminal Procedure – the defendant pled guilty pursuant to the Plea Agreement.

**3. The Plea Agreement and the PSR**

In the Plea Agreement, the parties calculated the Guidelines range to be 63 to 78 months' imprisonment. Specifically, the parties calculated an offense level of 26, starting with a base offense level of seven (*see* § 2B1.1), and applying a 20-level enhancement because the loss was between $9,500,000 and $25,000,000 (§ 2B1.1(b)(1)(K)), a two-level enhancement because the offense involved sophisticated means (§ 2B1.1(b)(10)(c)), and a two-level enhancement because the defendant abused a position of private trust and used a special skill in a manner that

significantly facilitated the commission or concealment of the offense (§ 3B1.3). The parties also agreed that a two-level reduction in the offense level was appropriate because the defendant met the criteria set forth in U.S.S.G. § 4C1.1(a)(1)-(11), and that the defendant was entitled to a three-point reduction for timely acceptance of responsibility.

In the PSR, Probation calculated the Guidelines Range to be 78 to 97 months' imprisonment. The only difference between Probation's calculation and the calculation arrived at by the parties in the Plea Agreement is that Probation concluded that the defendant was not eligible for a two-level reduction pursuant to U.S.S.G. § 4C1.1 because of the defendant's December 2013 conviction pursuant to a plea of nolo contendere for recklessly obstructing a highway, which resulted in a deferred adjudication and nine months of probation and 30 hours of community service. (PSR ¶¶ 22-32, 34.)

**B. Discussion**

**1. Applicable Law**

As the Court is well aware, the Guidelines continue to provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6. To the extent the Court imposes a sentence outside the Guidelines range, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 46).

**2. A Substantial Custodial Sentence Is Appropriate**

i. The Seriousness of the Offense

The defendant committed a serious crime. For the better part of a year, the defendant – while serving as Chief Executive Officer of the Victim Subsidiary and a member of the Board of Directors of the Victim Company – repeatedly and intentionally lied to the company about the success of his trading strategy in order to obtain an enormous monetary bonus. The defendant's conduct was not an isolated or momentary lapse in judgment or an impulsive decision. Rather, for months, he knowingly entered false information into his employer's accounting records and instructed other employees to manipulate the terms of previously agreed-upon contracts. The defendant's motivation was pure greed: as explained in the PSR, the defendant was laser focused on his bonus, as evidenced by his complaints about the discretionary bonus system to company executives in early 2016, and that the defendant had a dispute about the bonus with the company's primary HR professional. Ultimately, the defendant succeeded in obtaining an approximately $15 million bonus, of which over $11 million was paid immediately, through his lies and abuse of his position in the company.

Nor was this a victimless crime. The Victim Company not only paid more than $11 million to the defendant as a direct consequence of the defendant's deceit, but, even more, the impact of the defendant's lying resulted in enormous financial consequences for the company and its employees. Those consequences will be more fully articulated by the company in its Victim Impact Statement.

In short, the defendant, motivated by greed, repeatedly lied to his employer in order to significantly enrich himself to the devastating consequences of others. Therefore, the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, all warrant a substantial custodial sentence.

ii. The Need for Adequate Deterrence

There is also a significant need for the sentence imposed to afford adequate general deterrence to criminal conduct. The defendant's scheme was sophisticated, and, in no small part due to the defendant's own powerful role within the company, it took months for the Victim Company to uncover the defendant's conduct – at which point the company faced devastating financial consequences. Unfortunately, these sophisticated fraud schemes are all too common and, when conducted by a company insider in a position of trust, they can be difficult to detect. The sentence in this case must send a message that people who lie in order to steal from their companies – particularly when those people are in a position of power and trust at those companies – will face severe consequences.

iii. The Defendant's Conduct Since His Arrest and the Procedural History of this Case is Not a Basis for a Non-Custodial Sentence

The defendant rightfully points out that, consistent with the terms of the Plea Agreement, he paid $8 million in restitution to the Victim Company within two weeks of entering his guilty plea. And, of course, the defendant is entitled to credit for acceptance of responsibility for purposes of the Guidelines, as stipulated by the parties in the Plea Agreement. However, the Government wishes to clarify a couple points raised by the defendant in his submission with respect to the passage of time since the defendant's arrest and the defendant's conduct during that period – including the defendant's willingness and commitment to pay restitution.

As an initial matter, it is an undisputed fact that, in May 2016, the defendant received over $11 million from the Victim Company. These were not imaginary funds or a promise to pay the defendant at a later date: this is actual cash that went from the victim's bank account to the defendant's bank account.[2] From the day the defendant received that money in May 2016 until the defendant's guilty plea in May 2025, at no time did the defendant agree to return any of these funds to his victim. And it is clear from the defendant's submission and the PSR, as well as many

[2] Indeed, there was a deferred component of the bonus, which would have resulted in a total bonus of approximately $15 million. The deferred compensation was never paid.

of the letters written in support of the defendant, that in the interim nine years, the defendant used those funds for his own purposes – including to make investments for his own financial benefit.

The defendant was under no legal obligation to repay his victim while his criminal case was pending. But it bears noting, in light of the defendant's professed commitment to making his victim whole, that despite receiving $11 million in May 2016 and making numerous investments since that time, the defendant only agreed to pay $8 million to the victim once it was made a condition of his Plea Agreement, and he has not made any additional payments towards his restitution obligations. This is particularly concerning to the Government in light of the fact that the defendant's prior counsel specifically sought an adjournment of sentencing from September 2025 to November 2025 because the defendant was "in the process of selling real estate, the proceeds of which he intends to use to make restitution payments to the victim in this case," and the adjournment would "permit [the defendant] additional time to complete the process of selling property so that he can satisfy his restitution obligation to the greatest extent possible prior to sentencing." (Dkt. 131). Despite this claim, the defendant has made no further restitution payments – and now, in his sentencing submission, he suggests that he will "refurbish and bring to market two properties…by the end of 2026." (Def. Sentencing Submission at 25-26). If the defendant was fully committed to repaying his victim, these steps could have already been taken.

Moreover, the passage of time since the defendant's conduct and arrest does not justify the leniency the defendant now seeks. Indeed, the substantial period of time to bring the defendant to the point of acceptance of responsibility, and now sentencing, means that the defendant had the benefit of using the victim's money for nearly a decade. The defendant's long delay in repaying the victim – and indeed, *still* claiming to be unable to make the victim whole – thus does not weigh in the defendant's favor. In this regard, it bears noting that a significant reason for the delay in resolving this case was the defendant's own unwillingness to pay adequate restitution and/or sufficiently acknowledge wrongdoing. In light of the facts and circumstances here, the defendant should not receive a free pass for his crime based on the passage of time and his conduct since arrest.

iv. <u>The Government Recognizes that a Below Guidelines Sentence is Appropriate</u>

Despite the above, the Government recognizes that the legitimate ends of sentencing can be achieved with a sentence below the applicable Guidelines range. Among other things, the Government recognizes that the defendant's conduct, while not a fleeting or momentary lapse in judgment, appears to have been a divergence with the defendant's otherwise law abiding and productive life. In addition, the Government acknowledges that the defendant has significant family considerations – most notably related to his son's health condition – which, in the totality of the circumstances, weigh against separating the defendant from his family for more than five years. Therefore, the Government does not oppose a sentence below the Guidelines range, and respectfully submits that the Court impose a substantial term of incarceration, consistent with Probation's recommendation of 48 months' imprisonment.

**3. The Imposition of Forfeiture and Restitution**

The Government respectfully requests that whatever sentence is imposed include the imposition of forfeiture in the amount of $11,600,000 and restitution in the amount of $19,550,081,

as set forth in the plea agreement. A restitution order will be presented to the Court in advance of sentencing.

**C. Conclusion**

For the reasons set forth above, the Government respectfully submits that the Court should impose a substantial custodial sentence.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:

/s/
Matthew Weinberg / Qais Ghafary
Assistant United States Attorneys
(212) 637-2386 / -2534

cc: All Counsel (via ECF and Email)